## STATE OF NORTH CAROLINA v. STATE OF TENNESSEE.

### IN EQUITY.

No. 4, Original.   Argued October 15, 16, 1914.—Decided November 9, 1914.

Slick Rock Basin and Tellico Basin sections of the boundary line between North Carolina and Tennessee located and defined in accordance with the judgment of a commission appointed by both States in 1821 and ordered to be marked by commissioners to be appointed under decree in this case.

There being a question as to the exact location of this part of the boundary line and both States having in 1821 united in appointing a joint commission and having agreed to abide by its judgment, the question in this case is to determine what that judgment was.

Marks on numerous trees along the disputed line similar to marks on trees along the undisputed line given great weight in this case as evidence of location of the continuous line referred to in the judgment of the Commission.

When States enter into an agreement giving commissioners the power to exercise judgment as to exact location of the boundary between them, they must suppose that such judgment will be exercised as to disputed locations and that when exercised it shall be binding upon them both.

As the Cession Act of North Carolina of 1789 under which that State

ceded the western part of its territory to the United States and which was adopted by Congress was general in terms and necessarily demanded definition of the line both for purposes of private property and political jurisdiction of the States embodying such territory, an agreement made by the States to settle the exact line was in conformity with the act and did not require further consent of or sanction by Congress, nor was it in conflict with Article I, § 10, Clause 3 of the Federal Constitution prohibiting agreements between States without such consent.

THE facts, which involve the location of a part of the boundary line between the State of North Carolina and the State of Tennessee, are stated in the opinion.

*Mr. Thomas W. Bickett,* Attorney General of the State of North Carolina, and *Mr. F. A. Sondley,* with whom *Mr. Theodore F. Davidson* and *Mr. C. B. Matthews* were on the brief, for complainant.

*Mr. Charles T. Cates, Jr.,* with whom *Mr. Frank M. Thompson,* Attorney General of the State of Tennessee, *Mr. T. E. H. McCroskey* and *Mr. Samuel G. Shields* were on the brief, for defendant.

By leave of court, *Mr. W. D. Spears* and *Mr. L. N. Spears* filed a brief in behalf of Theodore Cobb *et al.*

MR. JUSTICE MCKENNA delivered the opinion of the court.

Suit in equity instituted by the State of North Carolina, as complainant, against the State of Tennessee, as defendant, for the purpose of having settled and determined the true location of part of the boundary line between the two States.

The pleadings consist of the original bill as amended, answer to the same, cross bill, and replication. Their

allegations need not be detailed. They accurately present the controversy between the parties and the relief prayed by each of them.

The controversy concerns only a part of the line between the two States called, respectively, the Slick Rock and Tellico basins or territories. The contentions of the States are exhibited in general outline by the map on the next page.

It is alleged by North Carolina "that dispute and controversy have arisen as to the true location of the State line between the extreme height of the mountain northeasterly of Tennessee River and the main ridge thereof southwesterly of the river" and she "has always believed and acted upon the belief, and alleges the fact to be, that the line between these points descends from the extreme height of the mountain northeast of the river to the river, crosses the river to a point in the southwest bank thereof just west of the mouth of the stream known as Slick Rock Creek, follows the creek a short distance to a ridge leading up to the main ridge, follows said ridge up to the summit, known as Big Fodderstack Mountain, and follows the main ridge thence to the junction of the Big Fodderstack and Hangover leads, and thence follows the main ridge of Unaka Mountain southwesterly."

Tennessee denies that the line described by North Carolina is the true boundary line, alleges that North Carolina at the time of filing her original bill "had not definitely determined how much of said boundary line she would dispute," alleges an extension of "the limits of the disputed zone," that complainant does not allege that the boundary as run and marked by the commissioners in 1821 (their appointment and action will be referred to hereafter) follows other than the extreme height of the mountain, which is agreeably to the cession act of 1789 (given hereafter), and expresses a willingness that the line should be so marked and established in the

orders of this court, and denies that it can be established agreeably to the cession act in any other place than along the extreme height of the mountain from the Tennessee River.

Further, Tennessee "denies that there is any uncertainty in regard to that part of the boundary line northeast of the river, and avers that said boundary line northeast of the river runs, and was so marked by the commissioners in 1821, down the crest of the main ridge of the mountain, which gradually lowers as it approaches the river, and on said line near to or on the bank of said river, about a half a mile above the mouth of Slick Rock Creek, a pine or hemlock tree was marked as a 'fore and aft tree,' which said tree is still standing, and is recognized as a 'fore and aft,' boundary line tree bearing the marks placed thereon by the commissioners in 1821, and described in the North Carolina Confirmatory Act and the report of said commissioners, hereafter shown." And avers "that said boundary line as described in said Cession Act of 1789, and run by said commissioners in 1821, crossed directly over the Tennessee River from said 'fore and aft tree' to the crest of the main ridge of the mountain, which is known as the Hangover ridge or lead—and which runs from the Stratton Bald northeasterly to the river, lowering somewhat as it approaches the river, where it ends or terminates in a bluff practically opposite said marked 'fore and aft tree,' thence along the crest of said Hangover ridge or lead to said Stratton Bald and the junction of Hangover with Fodderstack, the Fodderstack ridge, however, being several hundred feet lower than said main or Hangover ridge."

To these contentions the proof is directed, the record of which is voluminous. Besides other evidence, it is replete with the disputes of experts and of opposing deductions from their testimony. These, however, have their determination if not their reconciliation in certain dom-

inating elements upon which our judgment may be
rested.

. The territory constituting the State of Tennessee was
ceded to the United States by North Carolina in 1789.
In the act of cession the boundary line was, as described,
from the French Broad River westerly as follows: "Thence
along the highest ridge of the said mountain [Iron Moun-
tain] to the place where it is called Great Iron Mountain
or Smoky Mountain; thence along the extreme height
of said mountain to the place where it is called Unicoi or
Unaka Mountain, between the Indian towns of Cowee and
Old Chota; thence along the main ridge of such mountain
to the southern boundary of this State." A deed was
made by North Carolina, in pursuance of the act of ces-
sion, in 1790 which followed the same description, as did
also the act of Congress accepting the cession; also the
constitution of the State of Tennessee.

In the year 1796 North Carolina passed an act appoint-
ing commissioners to settle the boundary line between
the State and the State of Tennessee. The latter State
also appointed commissioners with similar authority. In
pursuance of the authority the commissioners appointed
by the States settled the line from the east to a point on
the Great Iron or Smoky Mountain west of the Pigeon
River, marked by a stone set up on the north side of the
Cataloochee Turnpike road, about due north from the
present town of Waynesville, in Heywood county, North
Carolina, and about six miles east of the point where the
Tennessee River passes through the mountain range,
leaving the line to the southern boundary of the States
unmarked.

Subsequently each of the States (North Carolina in
1819, Tennessee in 1820) passed acts appointing commis-
sioners, to meet with commissioners appointed by the
other "and with them to settle, run and mark the bound-
ary line between" the States "agreeably to the true in-

tent and meaning" of the cession act. In the act of North Carolina it was provided that "this State will at all times hereafter ratify and confirm all and whatsoever the said commissioners, or the majority of those of each State, shall do, in and touching the premises, and the same shall be binding on this State"; and Tennessee enacted "that whatsoever the said commissioners, or those appointed by each State, shall do in and touching the premises shall be binding on this State."

Three commissioners were appointed by each State, who met and proceeded to the execution of their duties and made report thereon to the respective States as follows:.

"Having met at the town of New·Port in the State of Tennessee on the 16th day of July A. D. 1821, to settle, run and mark the dividing line between the two States, from the termination of the line run by McDowell, Vance and Matthews in the year of our Lord, 1799, to the Southern Boundary of the said States, Respectfully Report, That we proceeded to ascertain, run and mark the said dividing line as designated in the XIth Article called the Declaration of Rights, of the Constitution of the State of Tennessee, and in the Act of General Assembly of the State of North Carolina, entitled 'An act for the purpose of ceding to the United States of America certain Western lands' therein described, passed in 1789:—Which said dividing line as run by us, Begins at a stone set upon the north side of the Cataloochee Turnpike road, and marked on the West Side *of* Ten. 1821; and the East side N. C. 1821, running thence a southwesterly course to the Bald Rock on the summit of the Great Iron or Smoky Mountain, and continuing southwestwardly on the extreme height thereof to where it strikes Tennessee River about seven· miles above the old Indian Town of Tellassee, crossing Porters gap at the distance of twenty-two miles from the beginning; passing Meig's boundary line at

thirty-one and a half miles:—the Equonettly path at fifty three miles;—and crossing Tennessee River at the distance of sixty five miles from the beginning. From Tennessee River to the main ridge and along the extreme height of the same to the place where it is called the Unicoy or Unaka Mountain, striking the old trading path leading from the Valley Towns to the Overhill Towns, near the head of the West fork of Tellico River, and at the distance of ninety three miles from the beginning. Thence along the extreme height of the Unicoy or Unaka Mountain to the Southwest end thereof at the Unicoy or Unaka Turnpike road, where a corner stone is set up, marked Ten. on the West side and N. C. on the East side; and where a Hickory tree is also marked on the South side Ten. 101 m. and on the North side N. C. 101 m. being one hundred and one miles from our beginning. From thence a due course South two miles and two hundred and fifty two poles to a Spruce Pine on the North Bank of High-wassee River, below the mouth of Cane Creek; thence up the said River the same course about one mile, and crossing the same to a Maple marked W. D. and R. A. on the South bank of the River; Thence continuing the same course due south Eleven miles and two hundred and twenty three poles to the Southern Boundary line of the States of Tennessee and North Carolina; making in all one hundred and sixteen miles and two hundred and twenty three poles from our beginning; and striking the Southern Boundary line twenty three poles West of a tree in said line, marked 72 m.—Where we set up a square post marked on the West Side Ten. 1821; on the East Side N. C. 1821; and on the South Side G. The said dividing line run by us in its whole length is distinctly marked with two chops and a blaze on each fore-and-aft tree, and three chops on each side line tree; and mile marked at the end of each mile; agreeably to the plats which accompanies this Report, and which plats and

Report are certified by us in Duplicate, one for each of said States, in the same words, marks and figures; which we respectfully submit to the Governors of the said States of Tennessee and North Carolina."

Each State ratified the line located by the commissioners, following in their respective enactments the description of the report of the commissioners, and North Carolina "fully established, ratified and confirmed" it "as the boundary line between the States of North Carolina and Tennessee forever"; and Tennessee "ratified, confirmed and established" it "as the true boundary line between this State and the State of North Carolina."

The instructions to the commissioners were "to settle, run and mark ["re-mark" are the words of the Tennessee act] the boundary line" between the States. The commissioners executed the duty and reported "that we proceeded to ascertain, run and mark said dividing line." The report gives the beginning and end of the line and the intermediate courses and objects and concludes as follows: "The said dividing line run by us in its whole length is distinctly marked with two chops and a blaze on each fore-and-aft tree, and three chops on each side line tree; and mile-marked at the end of each mile; agreeably to the plats which accompanies this report; and which said plats and reports are certified by us in duplicate, one for each of said States, in the same words, marks and figures; which we respectfully submit to the Governors of the said States of Tennessee and North Carolina."

Each State by its legislature confirmed the report and declared the line as settled and run the boundary line between them, and, it is to be presumed, after due consideration.

The immediate question, therefore, is, Where was the line run? And the answer would necessarily seem to be determined by the monuments, courses and distances, and, if these in any way conflict, by the line as marked

by the commissioners if it can be ascertained, and the plats which accompanied the report certified in duplicate.

On the report of the Commissioners no controversy was raised for years. It seemed to be certain, or rather was accepted as proof of what we may call for convenience the North Carolina contention. Tradition, supported, we think, by preponderating testimony, sustains it; and as early as 1836 it received some recognition from the legislature of Tennessee. In that year the State constituted a land district called the Ocoee District and provided for laying it out into townships, fractional townships, etc., and also provided for the entry and granting of the lands. The surveyor-general of the State, in accordance with the provisions of the legislation, surveyed and platted the lands and the plat shows that he made Slick Rock Creek the eastern boundary of the district. North Carolina surveyed the lands in the disputed territory in 1851 and made grants in 1853.

Upon an entry made in 1882 under laws passed by Tennessee and a grant from said State in 1892 the first judicial controversy arose over the boundary line and the contention of Tennessee was sustained. *Belding* v. *Hebard*, 103 Fed. Rep. 532.

The opinion in the case was delivered by the late Mr. Justice Lurton, then a judge of the Circuit Court of Appeals, and exhibits the usual care and ability of that learned Justice. He enumerates the contentions of the parties, the elements of the contentions, compares and weighs the evidence adduced for their support and concludes as follows (p. 546):—

"There has been, on the evidence in this record, no such long and continued recognition or acquiescence in the tentative line on Slick Rock creek as to justify this court in saying that it has been adopted as the actual line so long as to stand for a definition of the true and ancient boundary. The conclusions and findings of the

master upon the principal points in the case are not shown to have been so plainly erroneous as to justify us in overturning his conclusions as to the existence of the marked state-line trees on the Hangover, nor as to the fact that the Hangover was palpably the 'main ridge' called for in the commissioners' report and survey.

"The case, on the whole, is one not free from doubts engendered by the existence of the marked line on Slick Rock creek and its apparent recognition by the Tennessee surveyor general as the state line. The result reached by the special master, and confirmed by a most careful and conscientious trial judge, is a result which on the whole is most consonant with the calls in the cession act and the subsequent confirmatory boundary acts. The evidence relied upon to deflect the boundary from the line so plainly described by both acts settling the boundary is not so conclusive as to require us to reverse the action of the circuit court. The decree will therefore be affirmed."

The antagonism of the evidence to the North Carolina contention is put with more emphasis in *Stevenson* v. *Fain,* 116 Fed. Rep. 147, where, considering the controversy as to Tellico territory, Mr. Justice Lurton, again speaking for the court, said (p. 156) :—

"In *Belding* v. *Hebard,* 43 C. C. A. 296, 103 Fed. Rep. 532, we had occasion to ascertain a portion of this dividing line, a few miles northeast of the part now in dispute. In that case we had evidence of two different lines, both probably run and marked by the joint commission. The line called the 'Slick Creek' line was the better marked line, but was a plain departure from the call to follow the 'main ridge.' There was an old marked line on the 'main ridge,' and, though not so well marked, had the great advantage of being supported by the calls for course and the call for the extreme height of the 'main ridge.' Under the evidence, we held the latter to be the line 'run and marked' by the commission of 1821, and adopted by the

confirmatory acts of both States. In that case, as in this, we were confronted with the fact that the Tennessee Cherokee survey had stopped at the Slick Creek line, and in that way recognized that as the line. But upon the whole case we held that the evidence relied upon to pull the line away from the 'extreme height' of the 'main ridge' was insufficient. The marked difference between that case and this is, first, in the fact that the 'main ridge' called for in the confirmatory acts of 1821 was far more clearly ascertained than in the present case; and, secondly, there was in that case evidence that two lines had been run and marked and old state-line marks shown on both lines. The call for the 'main ridge' was, therefore, supplemented by the existence of artificial monuments, and this turned the scale over the other, although the more plainly marked line."

The "main ridge" and the "extreme height" thereof were considered by the court as dominant criteria and that the calls of the cession act and of the confirmatory acts of the State and the line run by the commissioners established Hangover to be the main ridge, and yet it was said, in estimate of opposing evidence, the case was not free from doubt. And in affirming the judgment, deference was expressed to the finding of the special master and Circuit Court.

We need not pause to weigh the evidence in that case. It is reproduced in this, but here there is further evidence which gives different probative quality to the circumstances which were considered controlling in that case. It may be true,—indeed, it is so alleged by complainant— that the boundary line between the two States may be generally described as following the main ridge or watershed of the Allegheny Mountain range, but it has many local names and the topography of the country made it far from indubitably clear where the boundary line of the States should be located. Commissioners were hence

appointed to locate it, and their appointment and the controversies and the litigation which have arisen demonstrate that there was room for a choice and judgment of location—to be specific, of ridges. The States, we have seen, agreed to abide by the judgment of the commissioners, and to ascertain their judgment then is, as we have said, the inquiry in the case.

The commissioners reported that they had distinctly marked the dividing line run by them in its whole length "with two chops and a blaze on each fore-and-aft tree, and three chops on each side line tree; and mile marked at the end of each mile; agreeably to the plats which accompanies this Report, and which said plats and Report are certified by us in Duplicate, one for each of said States, in the same words, marks and figures." These plats were not in the *Hebard Case.*

According to the report of the commissioners, the plat was certified in duplicate, one for each State. It may be that the one filed with North Carolina was lost or destroyed when the Capitol building of the State was destroyed in 1832; that filed with Tennessee was discovered in 1903 or 1904 by the State Archivist among papers supposed to be worthless. Its authenticity is not questioned.

In November, 1910, a book purporting to be the field notes of W. Davenport, the surveyor who accompanied the commissioners, was found by his grandson in an old desk or sideboard which belonged to Davenport in his lifetime. The first three pages of the book are in the handwriting of Davenport. Other pages of the book are not in his handwriting but in that of his wife, who often acted as his amanuensis. However, here and there are corrections by Davenport. The original book was exhibited at the argument and showed the following:

"W. Davenport's Field Book, July 18th, 1821.

"July 19th, 1821, began at the Catalucha track to run the line between the State of North Carolina and Tennes-

see.   Marked a rock there on North Carolina side N. C.
1821 and on the other side T. E. N. 1821—and runs with
the line that J. McDowell, M. Matthews and D. Vance run
in the year 1799, and runs with said line about 2 miles
and a half to where they stopped." Then follow the
courses and distances, with trees by name of kind and
other physical objects.

These documents are variously interpreted by the
experts of the parties.   To detail and compare these in-
terpretations and the arguments in support of them
would be a tedious task and would have to be very ex-
tensive to adequately represent their strength.   We have
estimated them, but consider that general comment rather
than specific review is sufficient.   The documents un-
doubtedly have inaccuracies and fault may be found
with them, but allowing for it they have a direction and
concurrent strength which cannot be resisted when com-
bined with other testimony, and demonstrate that the
commissioners did not locate the dividing line on the
Hangover ridge but located it along Slick Rock Creek
to Fodder Stack.   Their report agrees with such line and
the local topography justified its selection.   The dividing
line as run by them, they reported, began at "a stone set
upon the North side of the Cataloochee Turnpike road,
running thence a southwesterly course to the Bald Rock
on the summit of the Great Iron or Smoky Mountain
and continuing southwesterly on the extreme height
thereof to where it strikes Tennessee River  .  .  .  and
crossing Tennessee River at the distance of Sixty-five
miles from the beginning."   Thus far there is no dispute
or uncertainty.   "The summit" of the mountain and its
"extreme height" should determine the locality of the
line and the Tennessee River at a distance of sixty-five
miles from the beginning.   The next call has no such
certain and conspicuous witness.   The river is crossed, and
thence the line runs "to the main ridge" and then along

the "extreme height" of it. The words of the call suppose an interval between the river and the "main ridge" whose extreme height thereafter is to be followed,—to be definite, a course up Slick Rock Creek to Fodder Stack. But granting that it could be literally satisfied without supposing such an interval, that is, connecting immediately with Hangover ridge, we must resort to the evidence to resolve the conflict of suppositions. We find the first established by the evidence which we have referred to and the marks on the trees. And these marks have of themselves great strength of proof, irresistible strength when combined with the other testimonies. They are the same in character as those on the undisputed part of the line, made, therefore, to define the continuity of the line, and the report explicitly states that the line was so defined in continuity—marked "in its whole length." We certainly cannot consider that a few trees—two or three only—identified as "State-line trees," marked on Hangover ridge satisfy this statement or determine that a line along that ridge was the ultimate one selected and the other but tentative, notwithstanding there were found on it from the river to Fodder Stack twenty-seven marked trees and from the latter point to the junction about as many more. Conjecture against this we cannot indulge. Imagination is not proof, and, we repeat, whatever might be said of any particular piece of evidence standing by itself, their union and concurrence amount to demonstration. And, we repeat, it must have been supposed by the States when they constituted the commission that judgment would have to be exercised, and, when exercised, should be binding. The contention of North Carolina is, therefore, sustained by the proof as to Slick Rock basin.

But it is contended by Tennessee that if the commissioners located such line the location was a departure from the cession act and the act of Congress adopting it and that such line not having received the consent or sanction

of Congress is invalid and in conflict with Article I, § 10, Clause 3 of the Federal Constitution providing that "No State shall, without the consent of Congress,  .  .  . enter into any agreement or compact with another State," etc.  If the fact of such departure could be conceded the conclusion might be disputed.  *Virginia* v. *Tennessee,* 148 U. S. 503.  But the fact cannot be conceded. ' The cession act is very general and necessarily demanded definition to satisfy the requirements of a boundary line, a line not only necessary to mark private property but political jurisdiction.  This was realized and commissioners were appointed to run and settle the line exactly. Their work as executed was confirmed by the States.

The considerations which determine decision upon the contentions of the States as to the Slick Rock basin apply to the Tellico territory.  Indeed, they make more strongly against the Tennessee contention.  Without the newly discovered evidence the judicial judgment was adverse to that contention.  *Stevenson* v. *Fain, supra.*  The judgment is fortified by the evidence in this case.  The comments of the court' in that case and the considerations which have been expressed in this are sufficient to disclose the grounds of deciding that North Carolina is also right in its contention as to the Tellico territory and in the relief sought by its bill.

A decree should be entered adjudging that the disputed part of the boundary line between the States of North Carolina and Tennessee which was run by the commissioners appointed by the respective States in 1821 and who made report thereof dated at Knoxville, Tennessee, August 31, 1821, descends from the extreme height of the mountain northeast of the Tennessee River, crosses the river at a distance of sixty-five miles from the beginning to a point on the southwest bank thereof just west of the mouth of the stream known as Slick Rock Creek, follows the creek a short distance to a ridge leading up

to the main ridge, follows said ridge up to the summit known as Big Fodderstack Mountain and follows the main ridge thence to the junction of the Big Fodderstack and Hangover leads, and thence follows the main ridge of the Unaka Mountain southwesterly, according to the plat exhibited with this opinion. And, further, that commissioners be appointed to permanently mark said line.

The cross bill of the State of Tennessee should be dismissed.

Counsel for the respective States are given forty days from the entry hereof to agree upon three commissioners and to present to the court for its approval a decree drawn according to the directions herein given, in default of which agreement and decree this court will appoint commissioners, and itself draw the decree in conformity herewith. Costs to be equally divided between the States.

MR. JUSTICE DAY took no part in the consideration and decision of this case.