W. T. RUSSELL *et ,al. v.* AMERICAN ASSOCIATION *et al.*

(*Knoxville.*    September Term, 1917.)

1. **STATES.** Agreement or compact with another State. Constitutional provisions. Implied assent.

Under Constitution U. S. article 1, section 10, clause 3, providing that no State shall, without the consent of Congress, enter into any agreement or compact with another State, the formal consent of Congress to a compact between Tennessee and Kentucky looking to the establishment of their boundary line was not necessary, as such consent might be implied. (*Post, pp.* 130, 131.)

Case cited and approved: North Carolina v. Tennessee, 235 U. S., 1.

Case cited and distinguished: Virginia v. Tennessee, 148 U. S., 503.

Acts cited and construed: Acts 1821, ch. 44; Acts 1821, ch. 206.

Constitution cited and construed: Art. 1, sec. 10, ch. 3.

2. **PUBLIC LANDS.** Boundaries. Compact. Grants.

A joint boundary commission, appointed in 1779 to extend the boundary line of Virginia and North Carolina, running upon thirty-six degrees thirty minutes north latitude, ran a line, supposed to be due west, into Carter's Valley, and the Virginia Commission ran a line, known as Walker's line, from thence to the Tennessee river, leaving an unsurveyed gap from Deep or Clear fork to the first crossing of Cumberland river, which line deflected and reached the river on thirty-six degrees forty minutes north latitude. A compromise agreement was made in 1820, and thereafter ratified, adopting the Walker line from Cumberland gap to the Tennessee river and the line of thirty-six degrees thirty minutes north latitude from thence to the Mississippi, whereby Kentucky yielded the land between Walker's line and thirty-six degrees thirty minutes east of the Tennessee river, to Tennessee, which agreed that all vacant land should be the property of and subject to the disposition of Kentucky. Complainants in ejectment claimed under a grant from Tennessee

in 1849, and defendants claimed under a grant from Kentucky in 1880, the land lying between the Walker line and a line on thirty-six degrees thirty minutes north latitude. *Held*, that under the compact the Kentucky grant was valid, though the land was in Tennessee, and that Kentucky could not have abandoned such right by mere implication or by any conduct short of a clear and unmistakable affirmative act indicating a purpose to repudiate ownership.   (*Post, pp.* 131-134.)

Cases cited and approved:  Blair v. Pathkiller, 10 Tenn., 407;  Mc-Connell v. Mousepaine, 10 Tenn., 438;  Gillespie v. Cunningham, 21 Tenn., 19;  Phy v. Hatfield, 122 Tenn., 694;  Brannon v. Mercer, 138 Tenn., 415.

Case cited and distinguished:   Sharp v. Van Winkle, 80 Tenn., 15.

3. **PUBLIC LANDS. Estoppel. After-acquired title.**
Since a State in granting lands conveys without covenant, the doctrine of estoppel does not apply to a grant from the State so as to pass an after-acquired title, and such grant passes only the title the State then had.   (*Post, pp.* 134-136.)

Case cited and approved:  St. Louis Refrigerator, etc., Co. v. Langley, 66 Ark., 48.

Case cited and distinguished:  Casey v. Inloes, 1 Gill (Md.), 430.

FROM CLAIBORNE.

Appeal from the Chancery Court of Claiborne County.—HUGH G. KYLE, Chancellor.

FRANK PARK, JR., and CHAS. T. CATES, JR., for appellants.

MONTGOMERY & MONTGOMERY and SAMPSON & SAMPSON, for appellees.

Mr. Justice Williams delivered the opinion of the Court.

Complainants filed a bill to eject defendants from two tracts of land, of 5,000 acres each, alleged to have been granted by the State of Tennessee in 1849; one tract to Jacob Peck, who for many years was an associate justice of this court, the other to his son, Adam C. Peck. The beginning corner of the first-named grant is at the corner of the States of Virginia and Kentucky on the north boundary line of this. State, near Cumberland gap; and the second grant lies immediately west of the first. Both are located between what is known as the Walker line of 1779-80 and the latitude line of 36 degrees and 30 minutes north.

A brief history of the boundary line, run from time to time, is necessary in order to understand all phases of the pending litigation.

The unmarked parallel of latitude of 36 degrees and 30 minutes north was made by royal charter the boundary line between the colonies of Virginia and North Carolina, and that parallel was therefore the true line dividing the State of North Carolina from Virginia, and later Tennessee from Kentucky.

In 1779 the legislature of Virginia named Thomas Walker and Daniel Smith on the part of that State, and North Carolina named Col. Richard Henderson and William B. Smith as members of a joint commission to run and mark an extension of the boundary line between those stated, of which the

territory now within the States of Kentucky and
Tennessee were parts, respectively.    After fixing
upon the point of beginning as being in latitude
36 degrees and 30 minutes, "to the satisfaction"
of all, they ran a line, which was supposed to be
due west, about forty-five miles into Carter's valley.
Here a disagreement between Walker and Hender-
son led to a separation.   The Virginia commissioners
continued independently, and ran what is known as
Walker's line to the Tennessee river, leaving an
unsurveyed and unmarked gap, however, from
Deep or Clear fork to the first crossing of Cumber-
land river, a distance of about ninety-seven miles.
Later surveys developed the fact that Walker's
line deflected throughout to the north, owing to im-
proper allowance for the variation of the needle,
and as a result the Tennessee river was reached
near latitude of 36 degrees and 40 minutes, or more
than twelve miles north of the true latitude line.
The discovery of this deflection led the State of
Kentucky in the opening years of the nineteenth
century to insist upon a correction and to stand
for a reclamation of the strip from the State of
Tennessee.   After several futile negotiations between
the two commonwealths covering a period of nearly
two decades, the legislature of this State named two
of its ablest lawyers, Felix Grundy, who had been
Chief Justice of Kentucky, and who later represented
this State in the United States Senate, and was
attorney-general in the cabinet of President Van

Buren, and William L. Brown, who subsequently was a justice of this court, as commissioners to negotiate a treaty settling the dispute. Kentucky on her part named John J. Crittenden, one time a senator from that State and attorney-general in the cabinets of Presidents Harrison and Tyler, and Robert Trimble, who before that time was on the bench of the Kentucky court of appeals and who later was a justice of the supreme court of the United States. Judge John Rowan, of the court of appeals of Kentucky, also acted for that State in the negotiations which led up to the signing of the compact.

It may safely be asserted that never in the history of this country have two commonwealths met for treaty on any other occasion where they were represented by men of equal legal ability.

A compromise was embodied in a treaty of date February 2, 1820, which was ratified by the legislatures of the States represented. Broadly speaking, the Walker line was adopted from Cumberland gap to the Tennessee river, while between that stream and the Mississippi river the true latitude line was made the boundary line. These facts account for the offset in the north boundary line of this State at the Tennessee river, so plainly shown by maps of the two States. In consideration of Kentucky's yielding to Tennessee sovereignty over the strip lying between the latitude line and the Walker line,

east of the Tennessee river, it was agreed by Tennessee that all vacant land should be "the property of, and subject to the disposition of, the State of Kentucky," and that any grants which Kentucky might make were to be recognized as valid by the courts of this State.

Minor misunderstandings as to the true location of Walker's line continued · to arise, due in part to the fact that the gap above referred to had never been marked on the ground. In 1821 a joint commission, composed of Wm. Steele, on the part of Kentucky, and Absolom Looney, on the part of this State, surveyed, but inadequately marked this gap in, and as a part of, Walker's line; and their acts were confirmed by the respective legislatures in November, 1821. Acts Tenn. 1821, chapter 44; Acts Ky., 1821, chapter 206.

Growing out of such insufficient marking of the line by Steele and Looney, disputes still constantly arose as to the true location, and from a standpoint of showing jurisdiction in the respective commonwealths in the enforcement of their criminal laws, a more accurate survey and a detailed and permanent marking was found necessary. Therefore, in 1859, a joint commission composed of Benjamin Peeples and O. R. Watkins, representing this State, and Austin P. Cox and C. M. Briggs, representing Kentucky, undertook to run and mark the line as adopted in the compact of 1820.

139 Tenn.—9

The phraseology of that compact in respect of the line to be re-run along the territory involved in this litigation was:

"Walker's line, as the same is reputed, understood, and acted upon by the two States, their respective authorities and citizens."

The boundary commission of 1859 made an earnest and painstaking effort to carry out the true intent of the compact, and their work, promptly approved by the two legislatures, has sufficed to define the boundary between the two States till this day. The commission had the aid of skilled engineers, and at great expense marked the line by planting stone monuments. Their report, a duplicate, original of which is in the record of this cause, upon examination evidences as thorough work as the topography of the sections traversed would reasonably admit of.

One of the contentions of appellants is that, since the national Congress has never formally consented to or sanctioned the compact of 1820 between the States of Kentucky and Tennessee, that compact is invalid because in conflict with article 1, section 10, clause 3 of the federal Constitution which provides that:

"No State shall, without the consent of Congress, . . . enter into any agreement or compact with another State," etc.

This contention has been answered by the supreme court of the United States in *Virginia* v. *Tennessee,* 148 U. S., 503, 13 Sup. Ct., 728, 37 L. Ed., 537, where it was said:

"The Constitution does not state when the consent of Congress shall be given, whether it shall precede or may follow the compact made, or whether it shall be express or may be implied. . . . Where the agreement relates to a matter which could not well be considered until its nature is fully developed, it is not perceived why the consent may not be subsequently given. Story says that the consent may be implied, and [it] is always to be implied when Congress adopts the particular act by sanctioning its objects and aiding in enforcing them. . . . Knowledge by Congress of the boundaries of a State, and of its political subdivisions, may reasonably be presumed, as much of its legislation is affected by them, such as relate to the territorial jurisdiction of the courts of the United States, the extent of their collection districts, and of districts in which process, civil and criminal, of their courts may be served and enforced. . . .

"The approval by Congress of the compact entered into between the States upon their ratification of the action of their commissioners is fairly implied from its subsequent legislation and proceedings."

See, also, *North Carolina* v. *Tennessee,* 235 U. S., 1, 35 Sup. Ct., 8, 59 L. Ed., 97.

The next insistence of appellants is that since the lands lie within the boundary lines of this State, only the State of Tennessee had power to grant the lands in dispute.

The contrary was held in respect of lands lying between the line of latitude 35 degrees and 30 minutes and the Walker boundary line which were granted by Kentucky in the year 1851. *Sharp* v. *Van Winkle,* 12 Lea (80 Tenn.), 15. It was there said, in reference to the compact of 1820:

"It is obvious that the State of Tennessee, by this convention, parted with all its title to the lands mentioned which were claimed under the other States named, and if not in terms, in plain legal effect, granted to the State of Kentucky the vacant and unappropriated land specified, with an exemption from taxation for five years, if not sooner appropriated by individuals under titles derived from that State. Tennessee could not afterwards rightfully grant any of these lands, and no reason occurs why a general statute of limitations should not apply to them. A grant of land may be made by a State by statute, convention, or treaty reservation, as well as by warrant, entry, or grant proper. *Blair* v. *Pathkiller,* 2 Yerg., 407; *McConnell* v. *Mousepaine,* 2 Yerg., 438; *Gillespie* v. *Cunningham,* 2 Humph., 19. The Henderson grant of 200,000 acres in East Tennessee, and the grant to Gen. Greene of 25,000 acres in Middle Tennessee, were made by North Carolina by statute; Meigs' Dig., section 1815. Lands are granted by the State whenever the State makes a valid disposition or surrender of its interest therein."

Counsel of appellants undertake to distinguish the pending case by a reference to the fact that the Kentucky patents to appellees were issued in 1880, and by an assertion that the joint commission of 1859, not being able to find any marks of the old Walker line, undertook to abandon that as a boundary line; and, further, that it adopted a new and independent line, which in ratification by the two States became the true line, in respect of lands south of which Kentucky did not retain or stipulate for the title or the right to grant, on its part. The reply is manifold.

(a) This court held in *Sharp* v. *Van Winkle, supra,* that Tennessee had made a legislative grant to Kentucky of such unappropriated lands, which lands were to continue, however, under the sovereignty of Tennessee. As such grantee it is difficult to understand how Kentucky could abandon her rights by mere implication, or by any conduct short of some clear and unmistakable affirmative act indicating a purpose to repudiate ownership. *Phy* v. *Hatfield,* 122 Tenn., 694, 126 S. W., 105, 135 Am. St. Rep., 888, 19 Ann. Cas., 374; *Brannon* v. *Mercer,* 138 Tenn., —, 198 S. W., 253. It was not a mere power or privilege to make disposition that was granted to our sister commonwealth by the compact of 1820, but a right to dispose as owner, vested with title to that end, subject, of course, to the right of Tennessee to tax and govern as parts of the domain over which her sovereign power extended.

(b) If there had been an abandonment by Kentucky and a reversion of title to this State, such, according to appellant's own argument, must be assumed to have occurred in 1859-60. It is insisted that as Tennessee granted the lands to the Pecks in 1849, her after-acquired title, thus assumed, would inure to the benefit of the Pecks. This would not be the result.

The point was well ruled in *Casey* v. *Inloes,* 1 Gill (Md.), 430, 39 Am. Dec., 658. Since a State in granting lands conveys without covenant "the doctrine of estoppel does not apply to a grant from the State, so as to pass an after-acquired title, and such grant passed only the title the State then had."

See, also, *St. Louis Refrigerator, etc., Co.* v. *Langley,* 66 Ark., 48, 51 S. W., 68.

In this case the State of Tennessee was without title in 1849, and complainants therefore lack title in themselves to wage successfully a claim in ejectment.

(c) It appears from the report of the commission of 1859 that they found evidences of the markings of Walker made in 1779-80. We quote one paragraph, which relates to that line as it was run past the property in litigation:

"We have seen many of them (Walker line trees) west of the southeast corner of Kentucky, for several miles, and as far westward as he professed to run it, that is to the Clear fork of Cumberland

river, and they were uniformly marked with three chops, fore and aft."

By way of re-enforcement, and to preserve it as an interesting bit of local history, we here quote what is reported in respect of one of the two or more trees found west of Cumberland river, and on the southern line of Logan county, Ky.:

"On another beech tree, near the large one, we saw the names of 'James West, Isaac Bledsoe, 11th March, 1780.' We suppose these men were a portion of Walker's corps. All the chops had the appearance of being very ancient, and had doubtless been made by Walker's party. We did not block any of them, thinking it a shame that every vestige of Walker's ever having run the line should be obliterated; we were fully satisfied without doing it; and the beech stands there now, as it did when the surveyors in 1779-80 left it, not seeming to have lost any of its vigor by the lapse of ages."

The result, as well as the object of the labors of the commission of 1859, was not to run and mark a new line, but to re-mark the original Walker line.

The State of Tennessee gained much as the result of the compact of 1820, due to the willingness of our sister commonwealth to yield her claim to sovereignty over a large area in order not to defeat the wishes of many settlers in the strip to remain citizens of Tennessee. What was granted to Kentucky in the bargain embodied in the compact, by way of compensation, should not at this day be

denied by indirection or pared down. This court has once refused to give countenance to such an effort; and so far as we represent the sovereign power of this State, we think that that sovereignty may best be vindicated by holding to the spirit as well as the letter of the solemn compact of 1820. Complainants' case being devoid of merit, the chancellor's decree dismissing the bill on demurrer is affirmed.